# WHITE *v.* DUNBAR.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued October 29, November 1, 1886. — Decided November 15, 1886.

The claim of the inventor in letters-patent must be construed according to its terms; and when its import is plain, resort cannot be had to the context for the purpose of enlarging it.

A reissue which materially enlarges the claim in the original letters-patent, and which was made five years after their issue, is held to be invalid.

This was a bill in equity to restrain infringement of letters-patent. The case is stated in the opinion of the court.

*Mr. William G. Henderson* for appellants. *Mr. Joseph P. Hornor, Mr. F. W. Baker,* and *Mr. C. H. Joyce* were with him on the brief.

*Mr. Melville Church* for appellees. *Mr. Joseph B. Church* was with him on the brief.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a suit on a reissued patent. The appellees obtained a patent dated June 20th, 1876, for a method of preserving shrimps and other shell-fish by placing them in a bag or sack made of cotton, muslin, or other textile fabric, and then sealing them up in a metallic can, and subjecting them to a boiling process. In their specification they declare that the object of placing the shrimp in the bag is to keep them from coming in direct contact with the can, and thus prevent their discoloration and loss of flavor. They describe the process as follows:

"The shell having been removed from the shrimp in the usual manner, the fish is thrown into salt water of about six degrees, and there remains for an hour, more or less, and from thence to kettles filled with water and brought to a boiling heat, after which they are placed on dippers, and cooled and thoroughly rinsed with fresh cold water, and from which, so

soon as thoroughly dripped, in a moist condition, they are placed in the sack B, the same having been previously arranged in the can A, and without the addition of any salted or otherwise prepared liquid. So soon as the sack is filled, the mouth thereof being properly secured, the lid or head *a* is placed in position on the can A and immediately sealed.

"The cans are then subjected to a steam bath, or placed in kettles containing boiling water, and boiled for two hours at the highest temperature attainable, and which completes the process."

The claim is then stated, as follows:

"What we claim as new, and desire to secure by letters-patent, is —

"The herein-described method of preserving shrimps, &c., preventing their discoloration, which consists in placing textile fabric between the can and its contents, and then sealing the can and subjecting the same to a boiling process, substantially as and for the purpose specified."

In April, 1880, Pecor, one of the appellants, together with one Bartlett, obtained a patent for another method of preserving shrimps, by first lining the inside of the can with a coating of asphaltum cement, and then with paper coated with a solution of paraffine, or kindred substance; the can is then filled with shrimp, sealed up, and subjected to the boiling or steaming process, in the usual manner of canning vegetables and meats.

In April, 1881, the appellees surrendered their original patent, and applied for a reissue thereof, which was granted in December, 1881. In the new specification they describe their process to consist in; first, providing the can with a lining to prevent direct contact of the shrimps with the metal; and, second, placing them in the lined can while they are in a dry or moist condition and devoid of free liquid or gravy, sealing the can without adding any liquid to its contents, and cooking the contents of the can after sealing. They add that "there is nothing arbitrary about the peculiar form and construction of the textile fabric lining, as other forms and arrangements might be substituted therefor;" and again, "B is the lining, con-

structed preferably of cotton or muslin." The claim of the reissued patent is in the following words :

" What we claim as new, and desire to secure by letters-patent, is —

. " As an improvement in the art of preserving shrimps in metal cans, the mode of preventing the discoloration of the shrimps, which consists in interposing between the metal can and the shrimps an enveloping material for the shrimps, which is not itself capable of discoloring the shrimps, and then sealing the can and subjecting the same and its contents to a boiling process, substantially as described."

In March, 1882, the appellants commenced the canning of shrimps, and in their answer state that all the business of canning shrimps that they have ever done has been under the authority of the patent granted to Pecor and Bartlett. They further describe the process used by them as follows :

" The common tin cans being ready for packing, three pieces of paper, previously boiled in paraffine wax or coated with same, are cut and placed in the can, so that one piece covers the bottom, another piece the sides, and a third piece the top of the contents when the can is filled ; the shrimps are then picked raw, then washed and thoroughly cooked for about twenty minutes, until fit to eat ; they are then placed in the cans, which are soldered, and then put into a steam retort without water, which is heated to 240° Fahrenheit, where they remain from two and a half to three hours, which process has the effect of condensing the air and liquids in the can, and exterminating any animal or vegetable life that may remain in the contents of the can, after which they are ready to be labelled and sold."

The process thus used by the appellants is claimed by the appellees to be an infringement of their reissued patent ; they also contend that the claim of the reissued patent is no broader than that of the original, properly construed.

In the latter proposition we cannot concur. The claim in the original patent was for placing textile fabric between the can and its contents ; whilst in the reissue it is for interposing between the metal can and the shrimps an enveloping material

for the shrimps., This is certainly, on its face, a very important enlargement of the claim; and we see nothing in the context of the specification in the original patent which could possibly give the claim so broad a construction. The description of the invention, throughout, specifies a textile fabric as the material to be interposed between the shrimp and the metallic can. It is true that the object of the invention is stated to be "to prevent the article to be preserved from coming in direct contact with the surface of the can." But the object of an invention is a very different thing from the invention itself. The object may be accomplished in many ways; the invention shows one way. Again, in describing the nature of the improvement, the patentees say:

"Primarily, our improvement consists in so placing a suitable textile fabric between the fish or other article of food to be preserved as to cause it to intervene so as to prevent, under all circumstances, any direct contact between the metallic surface of the can and its contents; and it is the employment of such textile fabric, in connection with the process hereinafter described, of treating the fish or other article, both before and after the same is placed in the can and sealed, which constitutes the nature or subject-matter of our present invention."

Then, in describing the apparatus used, referring to the figures annexed to the specification, (which are not necessary to the understanding of the description,) they say:

"In the accompanying drawing is illustrated, at Figure 1, a metallic can, such as is ordinarily used for articles of food which are offered to the trade in a canned state. Fig. 2 is a textile lining, which we propose usually to make, (although there is nothing arbitrary about the form, as other forms may be used,) in the form of a cylindrical bag or sack, the diameter of which, when filled, is to be such as will permit of its fitting snugly within the can.

"A is the metallic can; a its lid or cover. B is the bag or sack, constructed of cotton, muslin, or any other suitable textile fabric. Material of the cheapest and most inferior quality may be used, as the sole object of its use is to prevent the article to be preserved from coming in direct contact with the sur-

face of the can, and which contact with the metal, in the case of the shrimp, causes, during the process of boiling, and all along thereafter until the can is opened, a profuse precipitation of a black substance, generally believed to be sulphur, and which supposition is based upon the fact that the shrimp is said to possess a much larger proportion of sulphur than other shell-fish. The substance thus precipitated not only discolors the fish (shrimp), but detracts much from the color, freshness, and richness of its flavor. Now, practical experience has fully demonstrated the fact, that, by using a textile fabric as described, the precipitation of the substance alluded to is prevented, or at least does not appear either on the fabric or metal; hence the value and importance of this feature of our invention. *b*, Fig. 3, is a circular piece cut out of material similar to that of which the bag B is made, and which is inserted within the mouth of the latter after the same is filled with the fish or other article to be preserved.

"Such a can and lining, as herein described, are admirably adapted for the purpose attained by our present invention; but, as before stated, there is nothing arbitrary about the peculiar form or construction of the textile fabric lining, as other forms and arrangements might be substituted therefor without in any manner altering the principle of the invention."

We see nothing in all this to raise the slightest implication that the patentees were the inventors of the process of interposing any and every kind of lining between the cans and their contents; and when their claim is confined to a lining of textile fabric, it is tantamount to a declaration that they claimed nothing else.

Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what

it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further. See *Keystone Bridge Co.* v. *Phœnix Iron Co.*, 95 U. S. 274, 278; *James* v. *Campbell*, 104 U. S. 356, 370.

We are clearly of opinion, therefore, that the original patent is not susceptible of the broad construction which the appellees would give to it; and that the reissued patent is a material expansion and enlargement of it. As such expansion appears to be the only object of the reissue, and as the application for the reissue was not made until nearly five years after the original was granted, the case comes within the ruling of *Miller* v. *Brass Company*, 104 U. S. 350, and subsequent cases to the same purport.

We attach no importance to the fact that between the date of the original patent and the application for the reissue, the patent to Pecor and Bartlett was granted. It is, indeed, quite apparent that the appellees applied for a reissue in consequence of that patent, and in order to prevent the canning of shrimps under it. The circumstance that other improvements and inventions, made after the issue of a patent, are often sought to be suppressed or appropriated by an unauthorized reissue, has sometimes been referred to for the purpose of illustrating the evil consequences of granting such reissues; but it adds nothing to their illegality. That is deduced from general principles of law as applied to the statutes authorizing reissues, and affecting the rights of the government and the public.

In our judgment the reissued patent in this case was unlawfully granted, and the bill should have been dismissed.

*The decree of the Circuit Court is, therefore, reversed, and the case remanded, with directions to dismiss the bill.*